### HOBBS v. KIZER.

(Circuit Court of Appeals, Eighth Circuit. October 11, 1916.)

No. 4706.

1. TRIAL ⬦⟶178—DIRECTED VERDICT—MOTION.
   On motion for directed verdict, the court must take the view of the evidence most favorable to the adverse party.
   [Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 401–403; Dec. Dig. ⬦⟶178.]

2. TRIAL ⬦⟶142—DIRECTED VERDICT—MOTION FOR.
   Only when reasonable men could not differ as to the conclusion to be drawn from the evidence is the court warranted in directing a verdict.
   [Ed. Note.—For other cases, see Trial, Cent. Dig. § 337; Dec. Dig. ⬦⟶142.]

3. PHYSICIANS AND SURGEONS ⬦⟶18(9)—ACTIONS—EVIDENCE—SUFFICIENCY.
   In an action for damages for performing an abortion on plaintiff without her knowledge and consent, evidence *held* sufficient to go to the jury.
   [Ed. Note.—For other cases, see Physicians and Surgeons, Cent. Dig. § 44; Dec. Dig. ⬦⟶18(9).]

4. COURTS ⬦⟶356—FEDERAL COURTS—REVIEW—FINDINGS.
   Under Rev. St. § 1011 (Comp. St. 1913, § 1672), providing that there shall be no reversal for any error in fact, the jury's finding of facts on conflicting evidence is conclusive on the Circuit Court of Appeals.
   [Ed. Note.—For other cases, see Courts, Cent. Dig. § 937; Dec. Dig. ⬦⟶356.]

In Error to the District Court of the United States for the District of New Mexico; John C. Pollock, Judge.

Action by Pearl Kizer against J. L. Hobbs. There was a judgment for plaintiff, and defendant brings error. Affirmed.

E. C. Crampton, of Raton, N. M., and Charles A. Spiess, of East Las Vegas, N. M., for plaintiff in error.

A. C. Voorhees and H. L. Bickley, both of Raton, N. M., for defendant in error.

Before CARLAND, Circuit Judge, and TRIEBER and VAN VALKENBURGH, District Judges.

TRIEBER, District Judge. The defendant in error, plaintiff in the court below, instituted this action in the District Court against the

plaintiff in error, defendant in the court below, to recover damages for an abortion alleged to have been committed on her by the defendant without her knowledge and consent. There was a trial to a jury, which resulted in a verdict for the plaintiff. This writ of error was sued out by the defendant for the purpose of reversing the judgment entered upon the verdict of the jury.

The complaint charges that the defendant was a physician and surgeon in the city of Raton, state of New Mexico; that the plaintiff in April, 1914, was a patient of his, and while the relationship of physician and patient existed the defendant induced the plaintiff to have illicit sexual intercourse with him; that as a result of said illicit intercourse plaintiff became pregnant; that about the first week in August, 1914, plaintiff informed the defendant of the nature of her condition of pregnancy, and defendant assured plaintiff she was not pregnant, and induced her to submit to an examination by him to determine the cause of the condition which led the plaintiff to believe she was pregnant; that plaintiff submitted to said examination, and defendant, after making such examination, represented to her that her condition was due to an abscess in the vagina; that the defendant used instruments in making said examination, and fraudulently and deceitfully, and without the knowledge of the plaintiff, removed the foetus from the womb of the said plaintiff, by reason whereof plaintiff became seriously ill and was removed to a hospital, where defendant performed an operation, as plaintiff believed, for the removal or treatment of said abscess, but which was in fact to remove the effect of said abortion; that she at no time consented to the performance of said abortion; that the acts of the defendant were wholly against her will. The defendant's answer was a general denial.

The only ground upon which the defendant seeks a reversal by his assignment of errors is that the court erred in refusing to instruct the jury to return a verdict for the defendant.

[1, 2] The well-established rule is that on a motion for a directed verdict the court must take the view of the evidence most favorable to the adverse party. Crookston Lumber Company v. Boutin, 149 Fed. 680, 79 C. C. A. 368; Southern Ry. Co. v. Gadd, 207 Fed. 277, 125 C. C. A. 21, affirmed 233 U. S. 572, 34 Sup. Ct. 696, 58 L. Ed. 1099. Another rule, equally well established, is that only when all reasonable men, in the honest exercise of a fair, impartial judgment, would draw the same conclusion from the facts which condition the issue, it is the duty of the court to withdraw that question from the jury. District of Columbia v. Robinson, 180 U. S. 92, 21 Sup. Ct. 283, 45 L. Ed. 440; Delk v. St. Louis & San Francisco R, R. Co., 220 U. S. 580, 587, 31 Sup. Ct. 617, 55 L. Ed. 590; St. Louis, Iron Mountain & Southern Ry. Co. v. Leftwich, 117 Fed. 127, 54 C. C. A. 1; Teis v. Smuggler Mining Co., 158 Fed. 260, 85 C. C. A. 478, 15 L. R. A. (N. S.) 893; Insurance Co v. Hoover Dist. Co., 182 Fed. 590, 598, 105 C. C. A. 128, 136, 31 L. R. A. (N. S.) 873; Liberty Bell Gold Mining Co. v. Smuggler-Union Mining Co., 203 Fed. 795, 800, 122 C. C. A. 113, 118.

[3] The evidence in this case is conflicting. A review of the evidence shows: The plaintiff testified:

That she was ill, and called on the defendant to treat her as her physician. While this relationship existed, he persuaded her to consent to sexual intercourse. About August 14, 1914, she realized that she had become pregnant, and went to the defendant and told him of her condition. He made an examination, and told her that she was mistaken, and then told her to come the next day for another examination. The second examination was made with instruments, and she suffered untold agony, and although she wanted him to stop he refused to do so. He then told her to go to her room and he would take care of her. He then sent her to the hospital, where he performed another operation. She also testified that she had explained to him her condition; that she had morning sickness, and such a feeling that she could not work, and wanted to know what her condition was, so that she might leave the place where she was living, as she did not want them to know her condition. She was then employed as maid at the residence of Mrs. Naylor. She told Dr. Hobbs that she had no money, and if she was pregnant she wanted to go some place where she could be taken care of, being penniless. "I told the doctor that my menstruation had stopped for over a month." In a few days after the operation had been performed, her breasts became very hard, caked, and were very painful. She asked the defendant what was the cause of this, and he told her he did not know. "He asked me if there was milk in my breasts." She told him, "I thought you said there was nothing wrong;" and he replied, "Well, milk and water together; there was nothing wrong with you." She testified that her breasts were very hard, very full, had milk in them, and were massaged. They were taken care of by different nurses, at different times during the day and night. Her breasts became in that condition a few days after the operation. "After the operation I was flowing, and continued flowing for two weeks after I left the hospital." Dr. Lyon and Miss Palmer, the head nurse of the hospital, and Mrs. Allen, "my own nurse," were present when the operation was performed by the defendant. Dr. Lyon gave her the ether. The defendant had told her he was going to operate for an abscess, but denied that she was pregnant. She denied that she ever consented to the abortion. Afterwards she was very weak, and her womb hurt her all the time, so she could hardly work. She then secured the services of Dr. Colehousen, but he left and sent her to Dr. White. Dr. White attended her for several months, and during most of the time she was unable to do any work, being confined to her bed. Dr. White has since left New Mexico, and is somewhere in Old Mexico, but his address is unknown to the plaintiff. Her bill at the hospital was $37, and was paid by some one; but she did not know of her own knowledge who paid it.

Dr. Whitcomb, a physician and surgeon residing at Raton, N. M., testified:

That he was the medical superintendent of the hospital at which the plaintiff stopped when the operation was performed by the defendant. The records of the hospital showed that the defendant performed an operation on the plaintiff on the 11th day of August, 1914. The record showed that when the plaintiff was operated on there was dilation, curettment, puncture, and drainage of the cul de sac Douglass. He explained that the dilation refers to the opening of the womb by the way of the cervix, curettment is scraping of the inside of the womb, a puncture is the opening of some cavity, and drainage is the opening up so that the contents can drain out; the records would come from the doctor who did the work, reporting to the nurse, so she could enter it in the "history book." The records show that she was an inmate of the hospital from August 10, 1914, to August 25, 1914; there is a complete record of everything that was done during that time. He has examined the orders given by the doctor, and also the chart as furnished by the nurse, and became acquainted with the treatment and nature of the case therefrom. Curettment may be used by the medical profession in abortion cases; it is resorted to in the early months or early weeks of pregnancy; its object is to clean out any retained particles which may have been lodged or may have remained in the womb, and prevent sepsis, or blood poisoning. "I have read the records referring to the breasts of the plaintiff. They may become hard and painful after an ordinary childbirth, and we may get the same effects from an abor-

tion, although not quite so pronounced. The records show that on the 16th the bandages were changed and the breasts massaged with camphorated oil; on the 17th and 18th the bandages were changed and the breasts massaged; on the 19th the breasts were very hard and swollen, and on the 20th the bandages were changed and the breasts massaged, and on the 21st the breasts were bandaged and massaged. This is the usual treatment for any trouble of the breasts. From some of the symptoms described in regard to the condition of the breasts, one might have thought, or might think, that pregnancy had been shortly before; but a menstruation might also cause changes to take place in the breasts." He also testified that curettment would not be the proper proceeding in treating just for abscess. The record showed that on August 17th there was paid to the hospital $25 in cash, and on August 28th, $12.65; but he did not know who paid that money.

On the part of the defense Dr. Lyon testified that he administered the ether at the time of the operation at the hospital; that the defendant scraped the womb and opened an abscess which was there. He found nothing among the scrapings that were taken from the womb indicating late pregnancy.

Miss Smith, another witness for defendant, testified that she was working at the Seaberg Hotel the early part of August when the plaintiff came there. She took care of the room occupied by the plaintiff. She was confined to her bed before she went to the hospital; saw her occasionally out of her room. There was nothing in the room indicating anything of an operation having been performed.

The defendant testified, denying the allegations in the complaint, and claiming that the operation he performed was for the purpose of removing an abscess, from which the plaintiff was suffering, and that he performed no abortion, as she was not pregnant.

Dr. Van Meter testified as an expert of great experience as a surgeon. He testified that from the condition of the plaintiff's womb at the time of the operation, as testified to by the witnesses, there had been no recent childbirth, or a delivery of anything through that opening; that hardness, tenderness, and soreness of the breasts of a female might result from a number of things other than pregnancy, childbirth, or abortion; might come from a bruise, injury, or as a reflex action from the menstruation. It may come from an operation on the female organs, or direct infection of the nipples, or from a curettment of the womb, or from an abscess in the region of the womb.

Mrs. Naylor, another witness on behalf of the defendant, testified that, the plaintiff lived at her house as a housemaid; she came there on April 20, 1914, and stayed with her until the 31st day of July, when she left, and returned on the 24th day of August; that until the 31st day of July she did her work without any complaint, and as near as she could remember the plaintiff had her menstruation during the month of June, 1914, but not during the month of July. As the plaintiff testified that she only ascertained her pregnancy in August, this testimony is, of course, immaterial.

We have set out the evidence thus fully, and we are of the opinion that it was of such a nature that it cannot be said all reasonable men would draw the same conclusions therefrom. If the testimony of the plaintiff is to be believed, and when taken in connection with the other circumstances—that she was taken to the hospital; that some one else

paid her bill while there, most likely the defendant, for no one else could have sufficient interest in her to do it; that the operation was performed there by the defendant without any charge, he employing Dr. Lyon to assist him—it was proper to submit the case to the jury. They were the triers of the facts, the judges of the credibility of the witnesses, and the weight to be given to their testimony. The jurors, as well as the trial judge, had the opportunity of seeing the witnesses while testifying, noting their demeanor on the witness stand, and were therefore better able to judge what weight to give to the testimony than an appellate court, reviewing the evidence from a printed record.

[4] It is not claimed that the trial judge committed any error in his charge to the jury, and the jury's finding of facts on conflicting evidence is conclusive. Section 1011, Rev. Stat. (Comp. St. 1913, § 1672).

The judgment is affirmed.